825 So.2d 769 (2002)
Ex parte Robert A. TAYLOR, Jr.
(In re Robert A. Taylor, Jr. v. State.)
1990940.
Supreme Court of Alabama.
January 18, 2002.
*770 William E. Scully, Jr., Daphne, for petitioner.
Bill Pryor, atty. gen., and Sandra J. Stewart, asst. atty. gen., for respondent.
JOHNSTONE, Justice.
The defendant Robert A. Taylor, Jr., was convicted of capital murder and was sentenced to life imprisonment without parole. The Court of Criminal Appeals affirmed the conviction in an unpublished memorandum, Taylor v. State (No. CR-98-1641, December 30, 1999) 796 So.2d 452 (Ala.Crim.App.1999) (table); and Taylor petitioned us for certiorari review, which we granted to determine whether the trial court erred in admitting evidence of DNA matching over the defendant's objection that the State had failed to prove the scientific reliability of the method or technique used by the DNA analyst to declare that certain DNA samples matched and that certain others did not match. The method or technique not only included the use of polymerase chain reactions ("PCRs") to amplify, or to copy, certain DNA alleles but also included other bio-chemical manipulations of the DNA before and after the PCRs.
The defendant is not challenging the scientific theory of amplifying DNA alleles by polymerase chain reaction for the purpose of obtaining enough of the alleles to visualize for identification and typing. Rather, the defendant is challenging, as he did before and at trial, the failure of the State to prove the scientific reliability of the kits, supplied by Perkin-Elmer Company, which contained and constituted the method or technique the DNA analyst used to choose and to find the alleles to be amplified, to effectuate PCRs, and to visualize, to identify, and to type the DNA alleles after they had been amplified by PCRs. We affirm.
DNA is deoxyribonucleic acid. Virtually every cell, except the red blood cells, in a person's body contains DNA. The DNA in each cell of a person's body is identical to the DNA in every other cell of that person's body, irrespective of the location and function of the cells. While the DNA in each cell is allocated among chromosomes, this opinion need not elaborate on that allocation.
When the DNA in a chromosome is unwound and unfolded from its natural, compact configuration, the DNA is a linear structure millions of times longer than it is wide, even though the whole structure is still microscopic. While many locations along the length of the DNA in a chromosome in one person's cells are just like the corresponding locations along the length of the DNA in the corresponding chromosome in another person's cells, some other identifiable locations along the length of the DNA in the chromosome may differ among different people. These locations are called loci. A single one is called a locus. A DNA feature which constitutes the difference at a locus is called an allele.
A forensic DNA expert comparing two samples of DNA (from, for example, tissue, white blood cells, or semen) tries to identify and to type the respective alleles at a number of loci on the DNA in one sample, then to identify and to type the respective alleles at the corresponding loci on the DNA in the other sample, and then to compare the alleles at the corresponding loci on the DNA from both samples to determine whether the alleles match or *771 differ. Because the loci and the alleles are submicroscopic, the challenge is to find the corresponding loci and somehow to visualize the alleles there in order to type and to compare them.
After the crime in this case, the defendant gave statements to the effect that he did not participate in the crime, which occurred inside the victim's house, although the defendant was outside the house while his companion, without the defendant's complicity according to him, may have committed the crime. At trial the State called as its witness a forensic biologist specializing in DNA typing. Hereinafter we will call him "the DNA analyst." Over the defendant's objections, the DNA analyst testified that the respective alleles at certain loci on the DNA in a spot of blood on the defendant's tennis shoe matched the respective alleles at the corresponding loci on DNA taken directly from the victim. The DNA analyst testified further, also over defense objections, that only one in every 500,000 Caucasians or one in every 1.4 million black persons would share this combination of alleles. Also over the defendant's objections, the DNA analyst testified that the alleles at certain loci on the DNA of a cigarette butt found outside the victim's house matched the alleles at the corresponding loci on DNA taken directly from the defendant. Over further defense objections, the DNA analyst testified that only one in 218,000,000 black men or one in 16.5 billion Caucasians would share this combination of alleles. The DNA analyst testified that his DNA testing excluded Taylor as a contributor of blood on Taylor's companion's knife but did not exclude either the companion or the victim as contributors.
The trial court had conducted a pretrial hearing on the admissibility of the DNA evidence proffered by the State. There, the DNA analyst had testified:
"Q. All right. Briefly describe the DNA testing process that you used.
"A. The testing process goes through a series of stages. Starting and assuming that we have a stain or a biological material that is suitable for testing in the first place, you have to remove the DNA from that stain or material.
"Q. All right. And in this particular case, you did have, I guess, useful stains to compare to the known sample; is that correct?
"A. Yes. At least when I started, I did not know whether DNA would be there or not, and the process starts to determine whether DNA is even present or not, yes.
"Q. And you did determine that there was some DNA present in I think a cigarette butt, a shoe, and a knife?
"A. That's correct.
"Q. Um, what was the generalthe name of the general process that you used in this particular case or does it have a recognized name or PCR or
"A. PCR testing is what I used in this case. It stands for polymerase chain reaction.

"Q. Is that a method that is used in laboratories other than yours?
"A. Yes.
"Q. Can you give us other examples of other places that PCR is used?
"A. It's used in numerous forensic laboratories presently, but it is also used in research laboratories. It is a method used in medical diagnostics. It's also used in general research laboratories involving DNA and RNA research.
"Q. And can you briefly just describe that process.
"A. The PCR process involves having a certain amount of DNA that you've extracted and purified. That DNA is *772 what I would call a template or like the beginning, the actual sample, the real DNA portion of your sample.
"We then add the necessary ingredients, chemical ingredients to that, to a small portion or aliquot of that sample and put it in a small test tube or small tube to allow it to be copied.
"The copying process involves putting the test tube into a thermocycler, which is essentially a computer that heats and cools and cycles the sample through several cycles or numerous cycles to copy the DNA. Only portions or regions of the DNA in which we're interested get copied. The chemical ingredients are added such that it will copy the areas that we're interested in.
"The areas that we're interested in in forensics are areas that individuals are different from one person to the other. In other words, there'sthere will be sometimes just slight differences, but we try to find areas where people are greatly different from one person to the other." (R. 39-42.)
Likewise at trial he testified:
"Q. Would you briefly describe the DNA testing process.
"A. The process is a several step process in doing DNA typing. The first thing that you must do if you found a biological stain that merits further consideration, is you take the stain and remove the DNA from it. That process is called extraction. The DNA is removed, chemically removed from the other parts of the cell and is purified.
"The DNA then needs to be measured so we know how much there is. And if there is no DNA there, then that's generally the end of that sample, if there's nothing there. However, if DNA is present, you have to measure the DNA. That's called quantification. So we extract the DNA out of the sample and we quantify it to see how much we have.
"The next step we do in the process is to copy the DNA at the specific locations that we're interested in. We can't copy the entire DNA. It would be much too much, but there are specific locations in the DNA where individuals are different from one to another, so that we can look at areas that are different.

"Most of us have the same DNA. It's aboutor most of the DNA in all of us is the same. The DNA that makes your arms and legs and blood and eyes is generally the same kind of DNA. There are some locations though that make us and give us our individuality and some of those genetic locations are locations in which we're interested in that we can tell the difference between one individual and another. Okay.
"Q. And that's the way you obtain that information?
"A. Yes.
"Q. Do you use a copying process?
"A. Yes.
"Q. How does that work?
"A. Those specific regions of interest are copied and that copying process is called PCR, polymerase chain reaction. Suffice to say, it's like a biological Xerox. It takes the original DNA that's there and makes identical copies of what is presently there in the sample.
"Q. What are dot blots and were they used?
"A. That is the next step or one of the next steps or final steps that you would have in the DNA process. Dot blots are a visualization process to be *773 able to see what my result was after the copying has been done. There is literally a membrane that we use that has places on it that will light up a certain color and give us a color indication of what kind of DNA we had in the sample or what kind of type we have from that sample. And from that color indication are the dot blots. We can tell what DNA type that person is or isn't." (R. 944-46.)
On cross-examination at the pretrial hearing, the DNA analyst explained the necessity of the visualization after the polymerase chain reaction:
"Q. The PCR in and of itself, doesn't tell you anything about identification? In other words, if you stop there, you would not look at the product that you had at that point and tell anything about the identity of the people that gave you that, the sources of the DNA, could you? If you stopped right there at that PCR
"A. You mean if we didn't test the results of our PCR process?
"Q. Right. If you stopped right there right after the amplification process.
"A. Sure if we just left the chemical mixture in the tube and didn't do anything else, then we would have no clue as to whether it worked or anything." (R. 70-71.)
The DNA analyst's laboratory used a kit for both the PCR amplification, or copying, process and the visualization. The kit "is directly used in typing six genetic locations DQ Alpha, LDLR, GYPA, HBGG, D758, and GC." (R. 86.)
"Q. Now, included in that kit are things called primers; is that correct?
"A. Yes.
"Q. And the primer is used during the PCR process; is that correct? During the PCR amplification process; is that correct?
"A. That's correct.
"Q. What the primer does is it causes or it sets up the circumstance where theat specific locations, the DNA will copy itself, make copies of itself pretty much automatically under given chemical conditions; is that correct?
"A. Actually the primers don't cause it to happen, but they are like a beginning piece of DNA that will find the specific genetic location and lay down on the template to actually give a beginning to the copying process. The actual causes of the copying process to begin would probably be best referred to the polymerase enzyme that's in the reaction. That would drive the reaction in the enzyme.
"Q. Okay. And the enzyme, the polymerase enzyme is also included with this kit; is that correct?
"A. Yes.
"Q. So during that PCR, during that amplification process, you use a polymerase, correct?
"A. Yes.
"Q. And that's an enzyme. You also usealso in there it's a little bath, isn't it? Sort of a little bath where all this is done or test tube or something like that?
"A. Well, the copying process is in the test tube when it's put in the thermocycler.
"Q. Okay. And you put in there the stuff you got from your extraction process, right?
"A. Right. The items that go in there are the DNA from the sample.
"Q. Right?
"A. The primers from the kit.

"Q. Okay.

*774 "A. Those attach to the specific genetic locations of interest. There has to be a polymerase, some kind of DNA polymerase present to drive the reaction and then the reaction is buffered with necessary ingredients in buffers, specifically magnesium is a critical element that's involved in the copying process; and last, but definitely not least, are the nuclei tides or nucleic acids, because those are what you are building along the template to actually make, hopefully a perfect copy of the DNA of the original DNA that's in the sample.

"Q. Now, the kit that you get from Perkin-Elmer includes all four of the only thing i[t] doesn't include is the sample that you've extracted from your evidence, correct?
"A. That's correct.
"Q. Okay. So all these things, the polymerase, the primers, the buffers, and the nuclei tides all come from Perkin-Elmer, correct?

"A. That's correct.
"Q. Now, in the visualization process, you use the strips, Defendant's Exhibit 1, those strips, correct?

"A. Yes.

"Q. Okay. And you take the product of the PCR process and basically expose those strips to that product, correct?

"A. Yes.
"Q. Now, those strips are pretty complicated things, aren't they?

"A. Well, in theory it's really not that complicated, but, yes, to actually develop them and make them, yes, quite complex.

"Q. Okay. The strip that you call a membrane, right?
"A. Yes.
"Q. And the strip has imbedded on it pieces of DNA, known pieces of DNA, correct?
"A. That's true.
"Q. Pieces of DNA that sort of sit on the strip and then they kind of like have a little tag that hangs out here. Is that kind of right?
"A. Yes.
"Q. What it really is, it's at least at the important time, it's half a strip of DNA, half a strand of DNA, right?
"A. It's the DNA that's on the strips is single-stranded, yes.
"Q. It'swhen we talked about earlier DNA being a ladder, the DNA that's on those strips is basically cut in half lengthwise, right?
"A. Yes, I mean similarly.
"Q. Basically in a very simple way?
"A. Yes." (R. 90-91.) (Emphasis added.)
The kits are sold to the DNA analyst's laboratory by the Perkin-Elmer Company, a private company. The kits are manufactured by Perkin-Elmer or one of its subcontractors. The DNA analyst was not certain how the kits are produced. (R. 99.) The DNA analyst observed that Perkin-Elmer "may have another name now. They change names so quickly." (R. 75.) The DNA analyst's laboratory has "other companies and other kits." (R. 105.)
The DNA analyst did not know, of his own knowledge, what is in the primers (R. 100), although, without the primers, the DNA analyst "would not be able to do PCR, ... would not be able to replicate or amplify DNA" (R. 104; see also R. 105). Moreover, according to the DNA analyst, "[t]here's always improved methods of being able to visualize the results" (R. 106) after the amplification. The DNA analyst further admitted that he did not know what "quality controls ... may be used by *775 Perkin-Elmer Company or their contractor," "what standards the Perkin-Elmer Company has for its personnel and the qualifications and training of its personnel," "what audit procedures they use or even whether they use audit procedures for quality assurance and quality control," "what kind of" "calibration and maintenance program," "if any, Perkin-Elmer Company has or their subcontractor may have," "what the validation process has been for all of the specific alleles [he] test[ed] for in this system," or, "of [his] knowledge ...[,] anything about the validation process that has to do with these alleles that [he had] tested for in this case." (R. 100-08.)
The DNA analyst's testimony tended to prove, however, that, as a practical matter, the Perkin-Elmer kits produced accurate results. At the pretrial hearing he had testified:
"[O]ne of the ways we validate our typing methods is that we use NIST samples... to actually validate the kits that come into our laboratory and the reagents that we use.... I have known results or known genetic types and we type our reagents and chemicals with those samples and submit our results. It's somewhat like a proficiency test, except those samples are even of higher quality and higher standards than a general proficiency test." (R. 43-44.)
At trial he further testified that his laboratory checked the accuracy of its own DNA testing with controls, including controls applied to the kits bought from Perkin-Elmer.
"[W]hen we start the process, we have a negative control that is a tube that has nothing but the chemicals in it and it has no DNA in that tube. And the answer at the end should be nothing. There should be no quantity of DNA when I do the quantification process. There should be no DNA type at the end." (R. 950.)
A "positive control"
"that we use that when we do the copying process, we run a sample through the copying process and we already have the answer to that sample and that answer should come up when I get my answer with all the case samples that come up." (R. 950.)
Likewise, at the pretrial hearing, the DNA analyst had testified that his laboratory performs "quality control ... [on] each kit to make sure that the positive control gets the results that its supposed to get and all the negative controls get no results. (R. 100.)
Moreover, the State introduced categorical testimony by the DNA analyst to the reliability of the methods and procedures used by his department. During the pretrial hearing, he testified that "the DNA test procedures, in particular PCR, in use by the Alabama Department of Forensic Sciences [are] widely accepted in the scientific community as reliable." (R. 42.) At trial the DNA analyst testified that "the DNA methods [he had] described" are used not only in forensic laboratories but also in "almost all kinds [of laboratories] that would be involved in genetic research: HIV research, and any molecular biology or general research would use these same general techniques.... Just like I would expect it to bewith the right of controls, I would expect it to be reliable and accurate in forensic testing as well." (R. 946-47.) The DNA analyst further testified that "the DNA test methods [he had] described so far to the jury ... [are] used routinely in other forensic DNA laboratories in the United States and around the world" (R. 948), that "[t]he PCR process has been used in forensic testing for at least eight or nine years" (R. 948-49), and that "the National Research Council has *776 published a couple of studies, that generally validate the reliability of forensic testing, DNA tests" (R. 949). Finally, the DNA analyst testified:
"Q. Have the DNA test procedures used by your department been scientifically validated?
"A. Yes. To show in the community that the DNA testing procedures are both reliable and accurate, yes.
"Q. Have the DNA test procedures used by your department, have the underlying scientific theories been published in scientist journals and presented at scientific meetings?
"A. Yes." (R. 949-50.)
At trial, before the State introduced the results of the DNA testing against Taylor, he interposed, and the trial court overruled, this objection:
"Judge, at this point, I would object on the grounds, incorporating at this point the grounds I've previously made in other hearings before the Court. In particular, I'd object on the grounds that the State has failed to show that the various kits that were used to prepare this werethat those kits were prepared in accordance with the guidelines of the DNA Advisory Board and any F.B.I. guidelines that may exist. And secondly, in that thein particular, the methods of the Department of Forensic Sciences have not been shown to be in compliance with the guidelines of the DNA Advisory Board and any F.B.I. guidelines that are required by statute." (R. 964.)
The additional incorporated ground, asserted in the pretrial hearing, was that the State had failed to establish that the Perkin-Elmer kit methodology met the standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for scientific reliability. (R. 109-11.)
The State first argues that the trial court was authorized to take judicial notice of the scientific reliability of the Perkin-Elmer kits and, thereupon, to overrule the defendant's objections. The State second argues that it did factually prove the scientific reliability of the Perkin-Elmer kits and that this evidence supported the ruling by the trial court. We will examine both arguments.
The State first argues that the cases of Turner v. State, 746 So.2d 355 (Ala.1998), and Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999), authorized the trial court to take judicial notice of the scientific reliability of the Perkin-Elmer kits. The reliance by the State on these cases for this proposition is misplaced.
The primary holding of Turner on the topic of DNA matching evidence is that the question of
"[w]hether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible."
746 So.2d at 361 (emphasis added; footnote omitted). The defendant now before us does not challenge the performance of the procedures in his particular case. Rather, he objects to the failure of the State to prove the procedures were "otherwise reliable." That is, the ground of the defendant's objection was and is that the State failed to prove that the Perkin-Elmer kits were scientifically reliable for DNA matching in any case. In still other *777 words, the defendant does not claim that the DNA analyst failed to use the Perkin-Elmer kits in his particular case the way they were made to be used. Rather, the defendant grounds his objection on the failure of the State to prove that the Perkin-Elmer kits were so made and constituted that they would produce scientifically reliable results.
Turner explains that, if the admissibility of DNA evidence is contested, the trial court (not the jury) must "determine whether the proponent of the evidence sufficiently establishes" that the theory and technique are both "reliable" and "relevant," 746 So.2d at 361. The issue of reliability is the one critical to the case before us. Turner states this issue this way:
"Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based `reliable'?"
746 So.2d at 361 (footnote omitted). Turner recognizes that the Alabama Legislature, in adopting § 36-18-30, Ala.Code 1975, has expressly adopted the standard of Daubert, supra, for judging the admissibility of DNA evidence. Following Daubert, Turner holds:
"In assessing reliability, trial courts should look to several guiding factors, including: (1) whether the `theory or technique ... has been ... tested'; (2) whether the `theory or technique has been subjected to peer review and publication'; (3) whether the technique's `known or potential rate of error ... and... standards controlling the technique's operation' are acceptable; and (4) whether the theory or technique has gained `general acceptance' in the relevant scientific community."
746 So.2d at 359 (quoting Daubert).
The Turner Court did not hold that trial courts could take judicial notice of the scientific reliability of Perkin-Elmer kits. Turner did cite United State v. Beasley, 102 F.3d 1440, 1448 (8th Cir.1996), "(holding that reliability of the polymerase chain reaction (`PCR') method of DNA typing would be subject to judicial notice in future cases)," 746 So.2d at 362, but did not adopt this holding. Indeed, the DNA typing in Turner did not employ PCR.
The case now before us demonstrates why such broad statements as the Beasley holding must be interpreted to mean only that the courts of the jurisdiction may take judicial notice of the theoretical efficacy of PCRs to replicate properly isolated alleles. The evidence in the case before us demonstrates that what is nicknamed "PCR typing" really includes a series of DNA manipulations, not just the polymerase chain reaction to amplify, or to copy, the alleles of interest, but also to isolate the alleles to be amplified, to visualize them, submicroscopic as they are, after amplification, and to identify and to type them by kind or category. The testimony of the DNA analyst in this case admits that the techniques used for ostensibly accomplishing these manipulations differ and are still developing. One system may reliably achieve the manipulations, including PCRs, and another system may not. No court is accurately capable of noticing judicially that a generically described conglomeration of materials and instructions packed in a box and labeled "PCR kit" will constitute a scientifically reliable technique or method for accomplishing all of the necessary bio-chemical manipulations, until the scientific reliability of that particular conglomeration has been proved by evidence in at least one persuasive or binding case.
"We recognize that the state of scientific theories and the techniques for producing DNA evidence is not static, and that the scientific community undoubtedly will produce new theories and techniques *778 regarding DNA. Each new theory and technique will be subject to the test set out above until its reliability warrants judicial notice."
Turner, 746 So.2d at 362.
In Simmons, supra, the Alabama Court of Criminal Appeals did hazard the holding that "we take judicial notice of the reliability of the theory and techniques used in the PCR method of DNA analysis." 797 So.2d at 1146. The Simmons court bases this holding on Maples v. State, 758 So.2d 1 (Ala.Crim.App.1999). The frailty of the Simmons holding is that it does not identify which "PCR method of DNA analysis" has been proved reliable. Simmons identifies only "the PCR method used by the Alabama Department of Forensic Science's Birmingham laboratory." 797 So.2d at 1146. The Simmons defendant, who did not object to the DNA evidence, did not ask whether more than one kit or system was used in that particular laboratory at that particular time to achieve the "PCR method." Likewise, the Maples court identifies only "[t]he genetic systems [(plural)] the [Birmingham] laboratory uses." 758 So.2d at 48. The DNA analysis in the case now before us was performed in "the Mobile Regional Laboratory of the Alabama Department of Forensic Sciences." (R. 28.) No language in either Simmons or Maples and no evidence in this case before us establishes that the "PCR method" approved in either Simmons or Maples was the Perkin-Elmer kits used for the DNA analyses in this case.
Thus the trial court was not authorized to take judicial notice of the reliability of the Perkin-Elmer kits. Therefore the admission of the DNA evidence in this case cannot be affirmed unless the State factually proved the reliability of the kits. We hold that the State did.
The DNA analyst's testimony of the NIST sample validations and the positive and negative controls performed on the Perkin-Elmer kits tended to prove their scientific reliability. That is, each NIST sample validation and each positive control demonstrated that the kits could accurately identify a DNA sample of known identity, and each negative control demonstrated that the kits would not indicate identifiable DNA in the absence of DNA. Furthermore, the DNA analyst testified to four of the Daubert reliability factors adopted by Turner, supra, 746 So.2d at 359, as they applied to "the DNA test procedures, in particular PCR, in use by the Alabama Department of Forensic Sciences" and therefore, by implication, as they applied to the Perkin-Elmer kits he used. He testified that the procedures were tested in the sense that he testified that the procedures were in actual, widespread use in not only forensic laboratories but also genetic testing laboratories. He testified that the procedures had been published for peer review. He testified to the positive and negative controls on "the technique's operation." Turner, 746 So.2d at 359. And he testified that the procedures were "widely accepted in the scientific community as reliable." (Emphasis added.) The combination of (1) his explanations of the NIST sample validations and the positive and negative controls, (2) his testimony to the Daubert/Turner reliability factors, and (3) his general explanation of the operation of the Perkin-Elmer kits, sufficed to carry the burden of the State to prove the scientific reliability of the kits.
Because the State did, in fact, establish the aspect of the predicate for the admissibility of the DNA identification evidence challenged by the defendantthe reliability of the Perkin-Elmer kit technique or methodologythe trial court was right in overruling the defendant's objection and admitting the evidence. Therefore, the decision of the Court of Criminal Appeals *779 to affirm the defendant's conviction is due to be affirmed.
AFFIRMED.
HOUSTON, SEE, LYONS, HARWOOD, and WOODALL, JJ., concur.
MOORE, C.J., and BROWN, J., concur in the result.
STUART, J., recuses herself.[*]
BROWN, Justice (concurring in the result).
Although I agree with the majority's conclusion that the State established the reliability of the Perkin-Elmer test kits, I believe it was unnecessary, as a matter of law, to subject the kits to an analysis to determine their scientific reliability. The test kits do not present a new scientific technique; rather, they use the PCR (polymerase chain reaction) testing method, which is generally accepted by the scientific community. See, e.g., People v. Hill, 107 Cal.Rptr.2d 110, 89 Cal.App.4th 48, 59-60 (2001) (specifically discussing Perkin-Elmer test kits); and Lemour v. State, 802 So.2d 402, 407 (Fla.Dist.Ct.App.2001) (following the reasoning of Hill in holding that it is unnecessary to subject test kits using the PCR testing method to an analysis to determine the scientific reliability of the kits). See also Turner v. State, 746 So.2d 355, 362 (Ala.1998) (citing the holding in United States v. Beasley, 102 F.3d 1440, 1448 (8th Cir.1996), that in future cases judicial notice could be taken of the reliability of the PCR testing method); and Simmons v. State, 797 So.2d 1134, 1146 (Ala.Crim.App.1999) (holding that the PCR testing method is generally accepted by the scientific community). The test kits "do not represent a separate part of the typing process, but rather, simply contain materials for beginning the PCR process. See People v. Shreck, 22 P.3d 68, 81 (Colo.2001). Therefore, ... `questions as to the reliability of the particular type of... kit go to the weight of the evidence, rather than its admissibility.' Id." United States v. Trala, 162 F.Supp.2d 336, 346 (D.C.Del.2001). The test kit is "simply one tool for carrying out generally accepted PCR methodology." State v. Russell, 125 Wash.2d 24, 55, 882 P.2d 747, 768 (1994). See also Trala, 162 F.Supp.2d at 346. Moreover, "the forensic community and those quarters of the scientific community that have used [the test kits] uniformly assert [their] reliability." State v. Butterfield, 27 P.3d 1133, 1144 (Utah 2001) (citing scientific literature and numerous validation studies that conclude that the Perkin-Elmer test kits are scientifically reliable and holding that it is appropriate to take judicial notice of the inherent reliability of the test kits). Because I believe the majority unnecessarily subjects the test kits to an analysis to determine their scientific reliability, I concur only as to the result.
MOORE, C.J., concurs.
NOTES
[*] Justice Stuart was the trial judge in this case.