We granted certiorari review in order to determine whether the evidence was sufficient to support the jury's verdict. We hold that it was not.
Arthur James Smiley was convicted of murder and was sentenced to 20 years' imprisonment. The Court of Criminal Appeals affirmed the judgment of conviction. Smiley v. State,655 So.2d 1074 (Ala.Crim.App. 1993).
A summary of the facts follows: The victim, Beatrice Brown, was living with Smiley's brother in a "high crime area" in Birmingham, Alabama. On July 20, 1991, the brother telephoned Smiley at his house and asked him to come and visit with him and the victim. Smiley arrived at his brother's house sometime that afternoon. Smiley, his brother, and the victim sat on the front porch, talking and drinking beer and whiskey.
Between 7:00 and 8:00 p.m., Smiley, his brother, and the victim left the brother's house in Smiley's automobile. The three went to a "shot house" in Ensley, where they continued to drink. Around midnight, the brother stated that he wanted to go home and get some rest because he had to work the next day. The victim did not want to leave the shot house at that time. According to the brother, he gave the victim a $100 bill and then he and Smiley left the shot house. Smiley told the victim he would come back to take her home.
Smiley's car overheated on the way to drop the brother at his house, so they stopped at a gasoline station to put water in the radiator. During the drive to the house, the brother told Smiley that he had given the victim $100 and that he was upset with the victim. This *Page 1093 
prompted a discussion in which Smiley asked his brother whether life or money was more important. When they arrived at the house, Smiley asked a group of young men standing in front of an apartment building near the house whether they would rather have $100 or their lives. Smiley's brother responded "both of them."
According to the brother, he subsequently left the house and went to a friend's house. When he left the friend's house, he said, he "ran up on a lady friend" and they went to the Tourway Inn, where, he said, they spent the rest of the night. The police detective investigating the victim's death testified that the brother's name was on the register but that no time of arrival was noted on the register. The police detective acknowledged that someone else could have signed the register and that the brother could have signed the register and then left the motel. Apparently, the police did not attempt to contact the brother's "lady friend" for verification of the brother's alibi. Also, the brother testified that he knew of no reason why Smiley would want to harm the victim.
Smiley said he left his brother's house and returned to the shot house to pick up the victim, but that she was not there. He then went back to the brother's house. When Smiley arrived, his brother was not at the house. Smiley stayed and talked with the victim out on the porch. Later, they went inside and had sex. Afterwards, Smiley telephoned his wife and told her that he was coming home.
Smiley then got on an Interstate highway. His car overheated again, and he left the highway to look for a service station, but no stations were open. He said he went to a Waffle House restaurant to get change for a $5 bill. The police detective in charge of the investigation could not find a Waffle House restaurant in that area of town. However the officer did find an Omelette Shoppe restaurant in the area.
Smiley put some more water in the radiator and then went to Audrey Stewart's home. Smiley telephoned his wife from Stewart's house; then he spent the remainder of the night there. Audrey Stewart and her brother, both of whom lived in Audrey's home, testified at trial that Smiley was at Audrey's house from 3:00 a.m. until 9:30 or 10:00 a.m.
The forensic pathologist testified that the victim most likely died from strangulation. He also stated that her blood alcohol level was .235%, which indicates a significant degree of intoxication. The prosecutor did not ask the pathologist to estimate the time of death.
The forensic serologist testified that she analyzed vaginal, anal, and oral swabs taken from the victim's body. Semen found in the swabs was consistent with Smiley's DQ alpha blood type. She also stated that that blood type was consistent with the brother's blood type and with that of 1 out of every 15 black males. She could not state with any degree of certainty that the semen found in the victim's body was Smiley's.
Smiley's wife testified that she received two telephone calls from Smiley on the night of the killing, one between 1:00 and 1:30 a.m. and one between 2:00 and 5:00 a.m. This corroborates Smiley's testimony that he telephoned his wife twice that night.
Alfonso Simmons was standing in front of his apartment building, near the house of Smiley's brother, with some other young men, when Smiley and his brother arrived. It was at this time that Smiley asked Simmons and the other young men whether they would rather have $100 or their lives. Simmons heard the brother respond "both of them." According to Simmons, Smiley left the brother's house approximately 10 minutes after dropping off the brother.
Simmons saw another man drop the victim off at the house after 3:00 a.m. and leave. Simmons claims that he then saw Smiley again at the house. From his apartment, Simmons said, he saw Smiley and the victim sitting on the screened front porch of the house. Simmons heard the two talking loudly. Sometime later, Simmons went to his bedroom. Around 7:20 a.m. on the morning of July 21, he was awakened by a loud "boom sound" that he thought was a gunshot. He went out onto his porch and saw Smiley talking on a telephone. *Page 1094 
Simmons's testimony varied as to the time each of the events occurred, but the basic sequence of events as he related them did not change. He stated that he was not a good judge of time or distance. He also testified that he was currently on probation for possession of a firearm. He stated that he had been convicted of a drug offense for which he had been granted youthful offender status. He said he knew that he could be placed in prison again and he said he did not want to go back there. He denied that he had been offered any type of special treatment in exchange for his testimony. He did acknowledge that he hoped that his testimony helped his situation.
The victim's son was living at the house of Smiley's brother on the night of the killing. He had seen Smiley at the house early in the evening. Around 11:00 p.m. on July 20, the son returned home. He watched television until midnight, then went to his bedroom, located at the back of the house, and went to sleep. Around 2:00 a.m., he heard music coming from the living room, but he did not get out of bed. He woke up around 8:00 a.m. He found his mother lying in the living room on the floor by the couch. She was on her back, with her arms outstretched and with "one leg straight and the other one cocked up." She was wearing only a blouse, which was pulled up over her breasts, and a pair of underwear, which was around one ankle. He said he did not find it strange or out of the ordinary that his mother was lying naked on the floor, because, he said, he assumed she was sleeping. After noticing that she did not move, he checked for a heartbeat; he then telephoned the 911 emergency service to ask for assistance. Paramedics arrived, but were unable to aid the victim.
During the initial investigation, Smiley told police that he did not see the victim after he and his brother left the shot house. He stated that he was not on the front porch of the house at 7:00 a.m. on July 21. According to Smiley, the reason he did not tell the police that he had gone to the house a second time was that he wanted to protect the victim's reputation, as well as his own.
Even viewing the evidence in a light most favorable to the prosecution, as we are required to do, Ex parte Mauricio,523 So.2d 87 (Ala. 1987), we must conclude that the State did not present sufficient evidence from which a jury could conclude beyond a reasonable doubt that Smiley killed the victim. Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes aprima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.),cert. denied, 387 So.2d 283 (Ala. 1980). Here, the State did not present a prima facie case.
A person's mere presence at the time and place of a crime is not sufficient to justify a conviction for the commission of the crime. However, a person's presence at the time and place where a crime is committed, along with other facts and circumstances tending to connect that person with the offense, may be enough to support a conviction. Caulton v. State,500 So.2d 1316 (Ala.Cr.App. 1986).
The applicable test is whether a jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether the evidence excludes every reasonable hypothesis but guilt, but rather whether a jury might reasonably conclude that it does. Ex parte Mauricio,523 So.2d 87, citing Cumbo v. State, 368 So.2d 871
(Ala.Crim.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Stated differently, to support the jury's verdict of guilty, circumstantial evidence and reasonable inferences therefrom have to be inconsistent with any rational hypothesis of innocence.
The Court of Criminal Appeals stated in its opinion that "the State's evidence against the appellant was entirely circumstantial and very weak," and that court said, "[W]e find it barely sufficient to support the verdict. . . ." 655 So.2d at 1075. Additionally, that court stated, "[W]e agree with the trial court that it is a very close case." 655 So.2d at 1080.
The State's case against Smiley was based on circumstantial evidence, and the main evidence that the State contends links Smiley to the crime is that Simmons said he saw Smiley near the house approximately 40 *Page 1095 
minutes before the victim's body was discovered. Other evidence is that semen found inside the body of the victim was consistent with Smiley's DQ alpha blood type. Also, Smiley originally gave the police inconsistent statements as to his whereabouts on the night of the killing.
The State's evidence was not sufficient to exclude all reasonable hypotheses except that of guilt. Starting with the serological evidence, we note that the semen found in the body of the victim was consistent with that of 1 out of 15 black males. More importantly, the semen was consistent with that of Smiley's brother, who had been "upset" with the victim shortly before the killing. The police detective checking the brother's alibi did not confirm that the brother signed the register at the motel and did not confirm whether there was a female accompanying the person who signed.
Assuming that the jury believed Simmons's testimony that he saw Smiley at the house around 7:20 a.m., we note that mere presence at the scene of the crime is not enough to support a conviction. No physical evidence connects Smiley to the crime any more than it would connect his brother to the crime. In fact, the evidence would more strongly support a conviction against the brother, because he lived with the victim and had been upset with her on the night she was killed.
Based on our thorough review of the record, we must conclude that a jury could not reasonably find that the evidence presented by the State excluded every reasonable hypothesis except guilt. The judgment of the Court of Criminal Appeals is reversed, and a judgment is rendered for the defendant. SeeBurks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1
(1978).
REVERSED AND JUDGMENT RENDERED.
ALMON, HOUSTON, KENNEDY, INGRAM and COOK, JJ., concur.
MADDOX, J., dissents.