KELLUM, Judge.
The appellant, Jakarrey Deanthony Chambers, was convicted of two counts of murder, a violation of § 13A-6-2, Ala.Code 1975. The circuit court sentenced Chambers to 99 years’ imprisonment on each count, to be served consecutively.
The evidence presented at trial established the following pertinent facts. On January 29, 2011, Tasha Reed went to check on Roy Ezell and Sherley Ezell after she was unable to reach them by telephone. Reed considered Roy and Sherley to be her “godmomma” and “goddaddy.” (R. 244.) Reed decided to leave a note at the Ezells’ house after she was unable to reach them by telephone. When Reed arrived at the Ezells’ house, she noticed that their newspaper was in the front yard and that the mailbox was full. Reed,- who had a key to the- “burglar bar door” of the Ezells’ house, testified that the door could be locked only from the outside with a key. While attempting to open the door to the house, Reed looked through broken blinds in the window next to the door and saw Roy and Sherley lying on the floor with blood around them. Reed immediately ran to the neighbor’s house to telephone the police. Reed informed police that the door was locked when she arrived at the Ezells’ house.
Officer Zack Davis with the Mobile Police Department was dispatched to the Ezell residence and arrived at approximately 5:30 p.m. When Davis arrived he saw Sherley Ezell lying face down in the doorway, covered in blood. Sherley did not initially appear to be breathing but gasped for air after officers secured the scene. She was immediately transported to the hospital for treatment but died days later from her injuries. Officer Davis also saw Roy Ezell lying face down and covered in blood with a knife embedded in his back. Autopsies performed on Roy and Sherley indicated that both had blunt-force trauma tó the head consistent with having been struck with a baseball bat.
At the scene, officers found a pipe, similar to one used for smoking crack, and -a lighter on the electrical box in an unfinished area of- the garage. While photographing the ' scene, Ronnie Myers, a crime-scene investigator with the Mobile Police Department at the time, rolled Roy’s body over and found “a [fingerjtip of *432 a plastic latex glove .underneath his body.” (R. 307.) Forensic testing on a sample of blood taken from the latex glove indicated a mixture of blood with a “major [DNA] profile and a minor contributor.” (R. 425.) The major DNA profile belonged to Roy, and Chambers was included as a possible minor contributor. ■ According to the DNA profile, 1 in 209,000 random unrelated African-American individuals have a DNA profile that would be included as a possible contributor. Officers also discovered a bloody shoe print near Roy’s body that one of the officers believed was made by á Nike Air Force One athletic shoe. Photographs and measurements of the shoe print-were sent to the Federal Bureau of Investigation for analysis. The results of the analysis indicated that the shoe imprint found at the scene most closely corresponded to a Nike Air Jordan Fusion athletic shoe.
Police later searchéd a black Kia automobile owned by the Ezells and found in the possession of Chambers at Chambers’s residence. Using luminal, police detected blood on the right front floorboard mat, as well as a small amount of blood on the steering wheel. Underneath the floorboard mat, police found a dark red area that was dry, but not “scaly” and did not appear to be very old. (R. 315.) Forensic testing indicated that Sherley’s blood matched the blood found on the floorboard mat. Officers also found a pair of black Nike Air Force One athletic shoes in the trunk of the vehicle and various clothing.
During their investigation, police learned that Chambers had free access to the Ezells’ house. . Reed testified that Chambers knew the Ezells and was around their house often around the time , of the murders. In the early morning hours on the ■ day of the murder, Roy. telephoned Chambers at least 44 times.
Chambers gave six statements to police. Chambers gave his first statement to police on January 29, 2011. During his statement, Chambers confirmed that he was close to the Ezells and that he regularly drove the black Kia. Investigator Charles Bagsby testified that there were some inconsistencies in' Chambers’s first statement to police. Police confronted Chambers a second time the following day regarding the inconsistencies in his first statement. Bagsby questioned Chambers a third time in June 2011 after the forensic testing had been completed. Chambers gave Bagsby several inconsistent versions of what had happened. Initially, Chambers stated that a third person entered, the Ezells’ house, robbed them, and killed them with a baseball bat. Then Chambers stated that a Frye Park'gang was involved and named two members who had allegedly committed the crime. Chambers next alleged that a man named Michael Glenn was responsible for the murders. Chambers claimed Glenn was armed with a 9-mm handgun and described Glenn wearing “school clothes” during the murder, but denied seeing Glenn’s shoes. (R. 485.) Bagsby testified that at times during the interview Chambers admitted being present when the murders occurred and on at least one occasion Chambers told Bagsby ■the location. of Sherley’s body. Bagsby testified that at other rimes Chambers denied being present at the Ezells’ house when the murders occurred,
On June 12,' 2011, Chambers initiated contact with'police ánd gave his fifth statement in the investigation. Chambers informed police that Glenn was wearing a pair of black Nike Air Force One shoes and blue jeans when he' murdered the Ezells. Chambers also alleged that Glenn .was armed- with a baseball bat, which Ghambers stated Glenn retrieved from behind the door of the Ezells’ house. -'Cham *433 bers denied ever wearing gloves inside the Ezells’ house..
During his sixth and final statement to police, Chambers told Bagsby that he went to the Ezells’ house after work to make sure that they were “okay” but found them dead inside the house. (R. 493.) Chambers stated that he then went to CiCi’s Pizza with his girlfriend. Bagsby testified that Chambers did not telephone police upon finding the Ezells’ bodies because “he said he was scared, [and] that was pretty much it.” (R. 493.) Chambers was unable to explain how the door was locked after he left the Ezells’ house.
After both sides rested and the circuit court instructed the jury on the applicable principles of law, the jury found Chambers guilty of two counts of murder. Chambers subsequently filed a motion for a new trial that the circuit court denied. This appeal followed.
I.
Chambers first contends that the circuit court erred when it denied his motion for a judgment of.acquittal becaüse, he argues, the State presented circumstantial evidence that was insufficient to overcome the presumption of innocence and reasonable doubt. Chambers contends that the State failed to prove that he intended to cause the deaths of the Ezells.[1]
“ ‘ “In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all' legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” ’ Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ‘“The test used in determining the sufficiency of evidence to sustain a conviction is whether,, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’ Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘“When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.”’ Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. . Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
“‘The trial court’s denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the ’ defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, this court will determine only if legal evidénce was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). When the evidence, .raises questions of fact for the *434 jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for' judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).’ ”
Gavin v. State, 891 So.2d 907, 974 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004) (quoting Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992)).
“ ‘ “Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.” White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). “Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guiit of the accused.” Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985).’ ”
Hollaway v. State, 979 So.2d 839, 843 (Ala.Crim.App.2007) (quoting White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989)).
“‘In reviewing a conviction based on circumstantial evidence, this court must view, the evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 130 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961).’ ”
Bradford v. State, 948 So.2d 574, 578-79 (Ala.Crim.App.2006) (quoting Cumbo v. State, 368 So.2d 871, 874-75 (Ala.Crim.App.1978)).
A person commits murder if “[w]ith intent to cause the death of another person, he causes the death of that person.” § 13A-6-2(a)(l), Ala.Code 1975. With regard to the intent element, this court has stated:
“Normally there is no direct evidence of intent. ‘ “ ‘Intent, we know, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’” Ex parte C.G., 841 So.2d 292, 301 (Ala.2002), quoting Pumphrey v. State, 156 Ala. 103, 106, 47 So. 156, 157 (1908).’ ”
Brown v. State, 11 So.3d 866, 914 (Ala.Crim.App.2007). “ ‘The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury.’ ”11 So.3d at 914 (quoting Payne v. State, 946 So.2d 930, 935 (2006) (other citations omitted)).
When viewing the evidence in the light most favorable to the State, we find that the evidence presented at trial, albeit circumstantial, was sufficient to establish a prima facie case of murder. The evidence presented at trial indicated that Chambers knew the Ezells and that he had free access to the Ezells’ house. Roy Ezell telephoned Chambers numerous times immediately before the murders. At the time the Ezells’ bodies were found, the door to the Ezells’ house was locked. Testimony indicated that the door could be locked only from the outside with a key. Once inside, officers observed Sherley Ezell lying face down in the doorway and Roy Ezell also lying face down in the house. Both sustained blunt-force trauma *435 consistent with having been struck by a baseball bat.
While processing the scene, officers discovered the fingertip of a latex glove under Roy Ezell’s body that contained a mixture of blood; tests indicated the presence of Roy’s blood and that of another person. Forensic testing subsequently indicated a 1 in 209,000 probability that Chambers was the minor contributor in the mixture sample.
Later, police located the Ezells’ black Kia automobile in Chambers’s possession. Testing of the interior of the car revealed the presence of blood that did not appear to be very old. The blood found on the floormat was Sherley’s blood.
During the course of the investigation, Chambers gave six statements to police. In his third statement to police, Chambers told police that a third person had entered the Ezells’ house and had killed them with a baseball bat. In that very same statement, Chambers claimed that two members of a Frye Park gang committed the murders. Chambers subsequently changed his story again when he told police that a man named Glenn was responsible for the murders and that Glenn was armed with a gun. In yet another statement to police, Chambers stated that Glenn was armed with a baseball bat. Finally, in his sixth statement to police, Chambers stated that he went to the Ezells’ house, found them dead inside, then left and went out to eat with his girlfriend. In his interviews with police, Chambers admitted to being present when the murders occurred and on at least one occasion described for police the location of Sher-ley’s body in the house.
This Court’s duty is to determine whether there was legally sufficient evidence to support Chambers’s convictions for two counts of murder. See Gavin, 891 So.2d at 974. Given the evidence presented at trial and the standard by which this Court reviews that evidence, we conclude that there was sufficient evidence presented from which the jury could find Chambers guilty of murder. Accordingly, the circuit court did not err when, it denied Chambers’s motion for a judgment of acquittal.
II.
Chambers also contends that the circuit court erred when it denied his “motion to exclude the results of questionable DNA mixture samples alleged to have been recovered from the tip of a latex glove located under the body of Roy Ezell.” (Chambers’s brief, p. 13.) Specifically, Chambers contends that the evidence proffered by the State did not meet the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because the methodology used in testing the DNA samples was not properly analyzed using the Daubert standard. Chambers further contends that the admission of the scientific test results on the DNA samples was improper because Donna Gibbons, the scientist who testified at trial, “was not present during the testing, [did] not actually handle the DNA evidence, [was] not the supervisor of [Patrick] Goff [who actually conducted the test on the DNA evidence] and was not at the time the testing was conducted.” (Chambers’s brief, p. 18.) Chambers claims that Patrick Goffs failure to testify violated Chambers’s right to confront and to cross-examine witnesses called to testify against him.[2]
*436 In Ex parte Ware, 181 So.3d 409 (Ala.2014), the Alabama Supreme Court addressed the issue- whether Ware’s Sixth Amendment right to confront witnesses against him was violated'when the circuit court admitted into evidence a DNA-profile report that was based on the work of laboratory, technicians who did not testify at trial: The Court analyzed the United States Supreme Court’s decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and the decisions following Crawford, stating:
“The Sixth Amendment of the United States Constitution provides in part that, ‘[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him_’ In Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court held that the Confrontation Clause does pot bar admission of an unavailable witness’s statement against a criminal defendant if thé statement bears ‘adequate “indicia of reliability.” ’
“In Crawford, the United States Supreme Court overruled Roberts, rejecting the ‘reliability’ standard and holding that the right to confront witnesses applies to all out-of-court statements that are ‘testimonial.’ 541 U.S. at 68. Although the Crawford Court did not arrive ' at a comprehensive definition of ‘testimonial,’ it noted that ‘the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.’ 541 U.S. at 50.
[[Image here]]
“Since Crawford, the Supreme Court has released three decisions addressing the application of the Confrontation Clause to forensic-testing evidence. In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Supreme Court held that a sworn certificate of analysis attesting that certain materials were cocaine was a testimonial statement. The Court in Melendez-Diaz declined to create a forensic-testing exception, and it rejected the argument that the certificate at issue there was not testimonial because it was not ‘accusatory.’
“In Bullcoming v. New Mexico, — U.S. —131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Supreme Court held that the Confrontation Clause, applied to an unsworn forensic-laboratory, report certifying the defendant’s blood-alcohol level, where the report was specifically created to serve as evidence in a criminal proceeding and there was an adequate level of formalities in the creation of the report.
“In Williams v. Illinois, — U.S. - — , 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), the United States Supreme Court held, in a plurality opinion, that the Confrontation Clause was not violated where an expert was allowed to offer an -opinion based on a DNA-profile report prepared by persons who did not testify and who were not'available for cross-examination. Williams involved a bench trial in which a forensic specialist from the Illinois State Police laboratory testified that she had matched a DNA profile prepared by an outside laboratory to a profile of the defendant prepared by the state’s lab. The outside lab’s DNA report was not admitted into evidence, but the testifying analyst was allowed'to refer to the DNA profile as having been produced from the semen sample taken from the victim.
“The plurality opinion concluded that the analyst’s testimony was not barred *437 by the Confrontation Clause for two independent reasons, neither of which received the concurrence of a majority of the Court. First, the plurality concluded that the expert’s testimony was not admitted for the truth of the matter asserted but was admitted only to provide a basis for the testifying expert’s opinions. Second, the plurality concluded that the DNA-profile report was not testimonial because its primary purpose was not to accuse the defendant or to create evidence for use at trial, but ‘for the purpose of finding a rapist who was on the loose.’ Williams, — U.S. at -, 132 S.Ct. at 2228. The Williams plurality also noted the inherent reliability of DNA-testing protocols and the difficulties in requiring the prosecution to produce the analysts who actually did the testing.” ■ • ■
Ex parte Ware, 181 So.3d at 413-15 (footnotes omitted).
In light of the fractured decisions of the United States Supreme Court on this issue, our Supreme Court in Ware concluded that a case could be “made for both sides of the issue whether the DNA-profile report in [Ware’s] case was ‘testimonial’ -under the ‘holdings’ of Melendez-Diaz, Bullcoming, and Williams.” 181 So.3d at 416. However, the Court did not resolve, the issue because, it concluded that “the Confrontation Clause was satisfied by the testimony” of Jason E.. Kokoszka, an employee of Orchid Cellmark Laboratory “who supervised and reviewed.the DNA testing and who signed the DNA-profile report.” 181 So.3d at 416. The Court concluded
“that Kokoszka’s testimony in this case satisfied the purpose of the Confrontation Clause. Kokoszka signed the DNA-profile report and initialed each page of Cellmark’s ‘case file’ that was also admitted into evidence. Kokoszka testified that he was one of the individuals taking responsibility for the work that resulted in the report and that he had reviewed each of the analyses undertaken to determine that they were done according to standard operating procedures and that the: conclusions drawn were accurate and appropriate. Kokosz-ka’s testimony at trial provided Ware with an opportunity to cross-examine Kokoszka about any potential errors, or defects in the testing and analysis, including errors committed by other analysts who had worked on the case.”
Ex parte Ware, 181 So.3d at 416-17.
In the instant dase, Patrick Goff, a forensic scientist with the Alabama Department of Forensic Sciences (“DFS”) performed a DNA analysis on the blood mixture taken from the tip of the latex glove. Goff was unable to testify at trial, and Donna Gibbons, a forensic scientist also employed by DFS, testified on his behalf. Gibbons was not Goffs immediate supervisor and was not present when Goff tested the sample, but testified that she had reviewed Goffs test results and the case packet Goff had used when he made his interpretation about whether Chambers was included' in the DNA mixture sample. Gibbons explained that DFS took a “team approach” and that a “certain individual will screen evidence and then they will cut it, put it into a tube and then the next individual will take that to the DNA testing process and they will run that, and then another individual ... will come behind them and actually take the case packet, which is all the DNA testing process paperwork and write a report from all of that paperwork.”. (R. 403.) Gibbons, continued to explain that once a report is prepared, a second scientist will “come behind you and review all of that paperwork and come to their own conclusions and interpretations to see if the re *438 porting scientist reported it out correctly.” (R. 403.) Gibbons testified that she was the secondary scientist who reviewed Goffs work and the data in Chambers’s case. Gibbons testified that she had. to review the materials because it was standard procedure and it also was necessary in cases such as Chambers’s where the person who reported it was not available. Gibbons testified that the reviewing scientist “takes sole responsibility for [the report] also, so [he or she] is able to come testify ... about the evidence.” (R. 404.)
In reviewing Goffs work, Gibbons conducted two reviews. Gibbons testified that “[o]ne is a technical review to make sure the actual technical process was done correctly and administrative reviews, checking the case number, periods in the report ... making sure the names match in the case filed.” (R. 414-15.) Gibbons noted that there was no indication of an error in the population-frequency calculations that were performed in this case.
Gibbons testified that she made her own interpretations and conclusions based on the information in the case packet and compared her interpretations and conclusions with Goffs report. Gibbons testified that her conclusions were her own and that her conclusions in the DNA analysis matched those of Goff, who had been at DFS for approximately the same amount of time as her. Gibbons stated that Goff followed the rules and best practices in this case.
Gibbons’s testimony about the DFS processes, including her technical and administrative review of Goffs work that included the entire case packet and her independent conclusions based on her review of the entire case packet provided Chambers with ample opportunity- to cross-examine Gibbons regarding the DNA-analysis report. Therefore, we find that Chambers’s right to confront the witnesses against him was not violated when Gibbons testified on Goffs behalf regarding the DNA-analysis report.
Regarding Chambers’s contention that the Dauberb standard was not met in this case, § 36-18-30, Ala.Code 1975, provides that the Daubert standard applies to the admissibility of DNA evidence. In determining whether DNA evidence is admissible, circuit courts are to assess the reliability or validity of the evidence using the flexible analysis set forth in Dauberb, which employs the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance. Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005); and Turner v. State, 746 So.2d 355, 361 (Ala.1998).
In Turner the Alabama Supreme Court set out the following guidelines for the admission of DNA evidence:
“[I]f the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to § 36 — 18—30[, Ala.Code 1975], determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
“I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based ‘reliable’?
“II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based ‘relevant’ to understanding the evidence or to determining a fact in issue?
[[Image here]]
“Trial courts should make the ‘relevance’ assessment by addressing the ‘fit’ between what the scientific theory and technique are supposed to show and what must be shown to resolve the fac *439 tual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible.
“Of course, once a particular theory or technique has satisfied § 36-18-30, a court may take judicial notice of that theory or technique’s reliability. See [Ex parte ] Perry, 586 So.2d [242] at 251 [ (Ala.1991) ]; [United States v.] Beasley, 102 F.3d [1440] at 1448 [ (8th Cir.1996)] (holding that reliability of the polymerase chain reaction (‘PCR’) method of DNA typing would be subject to judicial notice in future cases); [United States v.] Martinez, 3 F.3d [1191] at 1197 [ (8th Cir.1993) ] (holding that the reliability of the restriction fragment length polymorphism (‘RFLP’) procedure was subject to judicial notice). We recognize that the state of scientific theories and the techniques for producing DNA evidence is not static, and that the scientific community undoubtedly will produce new theories and techniques regarding DNA. Each new theory and technique will be subject to the test set out above until its reliability warrants judicial notice.”
Turner, 746 So.2d at 361-62 (footnotes omitted).
In Alabama, we have adopted a “liberal test of relevancy, which states that evidence is admissible ‘if it has any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence.’ ” Hayes v. State, 717 So.2d 30, 36 (Ala.Crim.App.1997)(quoting C. Gamble, Gamble’s Alabama Evidence § 401(b)(1st ed.l995)(emphasis .original)). In the instant case, the evidence from the mixture was relevant to the issue whether Chambers was involved in the murder of the two victims, including Roy Ezell, under whom the tip of the latex glove with blood on it was found. If believed, the blood evidence on the glove placed Chambers at the scene of the murder and did not exclude Chambers as a possible perpetrator of the crime. Therefore, the first part of the Daubert test was satisfied.
The second part of the Daubert test addressing the reliability of the evidence was also satisfied. In determining the reliability and scientific validity of DNA evidence, courts should consider several guiding factors that include whether the theory or technique has been tested, whether the theory or technique has been subjected to peer review, whether the theory or technique has a known rate of error that is acceptable, and whether the theory or technique has gained general acceptance. Daubert, 509 U.S. at 593-94; Turner, 746 So.2d at 361. These factors do not represent an exhaustive list but are generally appropriate to consider in determining reliability. Daubert, 509 U.S. at 593.
At a pretrial hearing. Gibbons testified regarding the DNA testing of the sample and was admitted without objection as an expert in DNA. Gibbons testified that there was not a single national standard for testing and interpreting DNA mixtures but that there were generally accepted guidelines for testing mixtures. Gibbons explained that DFS followed the guidelines of the Scientific Working Group on DNA Analysis Methods (“SWGDAM”) and that SWGDAM advocates the imposition of written guidelines. Gibbons testified that there was not a standard way of testing *440 and interpreting mixtures because “with mixtures it can vary widely and there-is not a — it’s hard to say you got to do it this way — or it’s hard to figure out every possible way a mixture can happen to define in just one set of interpretation guidelines” given that every DNA mixture is different and there can be different amounts from different contributors in each sample. (R. 84.) Gibbons explained that the’ variances in the mixtures made it very difficult to construct a universal framework that would provide a standard for mixed interpretation. Gibbons noted, - however, that there were interpretation guidelines in the DFS standard operating procedure and explained the procedure in detail.
Gibbons testified that DFS had one of the better guidelines for mixture interpretation. Gibbons testified that DFS employed internal proficiency procedures and that an external audit was performed by individuals from outside laboratories within the United States every other year. According to Gibbons, these outside agencies reviewed DFS mixture interpretations and conducted file reviews. Gibbons described DFS standards as “rigorous” and testified that DFS scientists were more “conservative” in their interpretations of mixtures. (R. 90.)
Our review of the record convinces us that the State presented sufficient evidence at the pretrial hearing that the DNA evidence in this particular case satisfied both the reliability and relevance requirements of. Daubert. Therefore, we hold that the circuit court did not err .in denying Chambers’s motion to exclude this evidence.'
III.
Chambers next contends that the circuit court erred by denying his motion for a mistrial based on the circuit court’s improper jury instruction on accomplice liability.-. Specifically, Chambers argues that “[i]n essence, the accomplice liability charge was a fatal variance and constructively amended the indictment well after the original jury instruction and an Allen [v. United States, 464 U.S. 492 (1896)] charge ... [and] was unsupported by the evidence.” (Chambers’s brief, p. 38.)
The record indicates that during deliberations, the jury sent a question to the circuit court asking “i[s] a person who is present at a murder but does not actually do the killing by law [sic] still guilty of murder or a lesser charge? Does inaction cause/intent?” (R. 691, 704.) After a lengthy discussion and deliberation with counsel, the circuit court decided to charge the jury on accomplice liability as well as that mere presence at the scene does not equate to guilt. Defense counsel subsequently moved for a -mistrial based on the circuit court’s instruction on accomplice liability. The circuit court denied the motion for a mistrial.
“‘[A] mistrial “specifies such fundamental error in a trial as to vitiate the result,” Diamond v. State, 363 So.2d 109, 112 (Ala.Cr.App.1978), and should be granted only when a “high degree of ‘manifest necessity’ ” is demonstrated, Wadsworth v. State, 439 So.2d 790, 792 (Ala.Cr.App.1983), cert. denied, 466 U.S. 930, 104 S.Ct. 1716, 80 L.Ed.2d 188 (1984).’ Garnett v. State, 555 So.2d 1153, 1155 (Ala.Cr.App.1989).”
Levett v. State, 593 So.2d 130, 135 (Ala.Crim.App.1991).
“A mistrial is an extreme measure that should be taken only when the prejudice cannot be eradicated by instructions or other curative actions of the tidal court. Nix v. State, 370 So.2d 1115, 1117 (Ala.Crim.App.), cert. denied, 370 So.2d 1119 (Ala.1979). If an error can be effectively -cured by an instruction, a mistrial is too drastic a remedy and is *441 properly denied. Thompson v. State, 503 So.2d 871, 877 (Ala.Crim.App.1986).”
Ex parte Lawrence, 776 So.2d 50, 55 (Ala.2000).
“Alabama courts have repeatedly held that a mistrial is a drastic remedy, to be' used sparingly and only to prevent manifest injustice. The decision whether to grant a mistrial rests within the sound discretion of the trial court' arid the court’s ruling on a motion for a mistrial will not be overturned absent a manifest abuse of that discretion.”
Peoples v. State, 951 So.2d 755, 763 (Ala.Crim.App.2006).
To the extent that Chambers is arguing that reversible error occurred because the accomplice-liability instruction created a fatal variance with the. indictment, the record indicates that Chambers abandoned this claim below. When the parties returned from a break, defense counsel conceded that the circuit court was correct that complicity did not have to be alleged in the indictment and that charging on complicity did not create a fatal variance. Nevertheless, we note that it is well settled that the “ ‘State is not required to notify the defendant in the indictment or otherwise that it is proceeding ‘under a complicity theory.’” McGowan v. State, 990 So.2d 931, 985 (Ala.Crim.App.2003) (quoting Johnson v. State, 612 So.2d 1288, 1297 (Ala.Crim.App.1992)).
Regarding Chambers’s contention that the complicity charge impermissibly constructively amended the indictment, Alabama law provides that the giving of a complicity, charge does not constructively amend an indictment. See Howell v. State, 618 So.2d 134, 139 (Ala.Crim.App.1992) (“A conviction under an indictment charging a substantive offense on proof showing complicity does not constitute an amendment of the indictment.”). Therefore, Chambers is not entitled to relief on this claim.
Likewise, Chambers is not entitled to relief on his claim that the circuit court erred in denying his motion for a mistrial following its instruction on accomplice liability. As he did at trial, Chambers argues on appeal that the complicity instruction was error because the instruction was unsupported by the evidence. Chambers maintains that the State proceeded at trial under the theory that Chambers alone murdered the Ezells. A jury instruction is properly given if it is supported by the evidence, regardless of who requests the charge. See Apicella v. State, 809 So.2d 841, 857 (Ala.Crim.App.2000). The record indicates that the decision to give the complicity instruction was not based on the State’s theory of the case but, instead, was based on evidence presented at trial demonstrating that Chambers may not have acted alone. Particularly, in his statements, to police, Chambers claimed that another man— Glenn — was responsible for murdering the Ezells, but Chambers admitted to being present during the murders. The evidence presented, at trial, therefore, supported a complicity instruction. Given the drastic nature of a mistrial and the evidence presented at trial, we find no error on the part of the circuit court in denying Chambers’s, motion for a mistrial on the basis that it was error for the circuit court to instruct the jury on accomplice liability.
IV.
Finally, Chambers contends that the circuit court erred when it refused to give his requested Smiley v. State, 655 So.2d 1091 (Ala.1995), jury charge and that the circuit court’s failure to give the Smiley instruction combined with the court’s improper *442 jury instruction as to reasonable doubt constituted reversible error.
At the outset, we note that the record indicates that Chambers’s challenge to the circuit court’s jury instruction on reasonable doubt is raised for the first time on appeal. Alabama law has long held that “[a]n issue raised for the first time on appeal is not subject to review because it has not been properly preserved and presented.” Pate v. State, 601 So.2d 210, 213 (Ala.Crim.App.1992). “[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.” McKinney v. State, 654 So.2d 95, 99 (Ala.Crim.App.1995) (citation omitted). “The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.” Ex parte Works, 640 So.2d 1056, 1058 (Ala.1994). This is particularly true when an appellant challenges a circuit court’s jury instructions. Rule 21.3, Ala. R.Crim. P., provides, in pertinent part:
“No party may assign as error the court’s giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection.”
In order to preserve an issue regarding jury instructions for appellate review, the defendant must object before the jury retires to deliberate. See Davis v. State, 747 So.2d 921, 924 (Ala.Crim.App.1999); Hinton v. State, 632 So.2d 1345, 1350 (Ala.Crim.App.1993). Chambers did not specifically object to the circuit court’s jury instruction on reasonable doubt; therefore, this issue is not properly preserved for our review.
We now turn to Chambers’s contention that the circuit court erred by not giving his requested Smiley instruction. Although the record does not contain copies of defense counsel’s written requested jury instructions, the circuit court read defense counsel’s requested Smiley charge on the record during the charge conference. At the charge conference, the following exchange took place:
“THE COURT: As to [Chambers’s] requested charge on the Smiley case, I’ve been given the case, and [defense counsel], you may have a copy. I’ve been given the other case, a more recent case of [Ex parte ] Carter [889 So.2d 528 (Ala.2004)], and I couldn’t remember the cite last night, but I’m familiar with this Carter opinion suggesting that the Smiley rule, so to speak, really is not an accurate statement of law at this point. Have you seen the Carter opinion?
“[DEFENSE COUNSEL]: Your Honor, I did have a chance to read over it. What I would point out to the Court is what they seem to be saying in that opinion and I wrote it down, the only logical conclusion is that the defendant committed the crime, right. And if logic [and] common sense shows that’s the only conclusion the jury could come to, then a failure to give the circumstantial evidence charge that I’ve requested is not reversible error. Okay. What I’ve read from the opinion, the flip side of it is if the evidence supports any other reasonable hypothesis of guilty other than that of the defendant then he’s entitled to the circumstantial evidence charge as outlined in Smiley.
“THE COURT: Okay.
[[Image here]]
*443 “[PROSECUTOR]: I just respond that Carter is a correct statement issue of the law as well, Judge, and I don’t think based on that it’s the duty of the State to exclude every reasonable hypothesis other than that of the defendant’s guilt anymore.
“THE COURT: Based on the totality of evidence that I’ve heard in the trial and having reviewed the Smiley and Carter opinions, the Court is going to respectfully refuse to give the requested charge provided by Counsel on Smiley v. State. That charge I’ll read it just for the record, ladies and gentlemen of the jury, the evidence presented to you by the State in this matter constitutes circumstantial evidence. To find the defendant guilty, the circumstantial evidence presented by the State must exclude every reasonable hypothesis of guilty except that of the Defendant. If you find that the State’s evidence does not exclude every reasonable hypothesis of guilty except that of the defendant, beyond a reasonable doubt, it is your duty to acquit the defendant. And as I say based on the totality of the evidence and my review of the Smiley and Carter opinions, I’m going to respectfully refuse to give that charge.”
(R. 556-58; emphasis added.)
This Court has explained that:
“ ‘A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case.’ Coon v. State, 494 So.2d 184 (Ala.Crim.App.1986). ‘“When requested charges are either fairly and substantially covered by the trial judge’s oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges.”’ Ward v. State, 610 So.2d 1190, 1194 (Ala.Crim.App.1992) (quoting Ex parte Wilhite, 485 So.2d 787 (Ala.1986)).”
Edwards v. State, 139 So.3d 827, 832 (Ala.Crim.App.2013). Furthermore, the Alabama Supreme Court has explained that “ ‘Generally speaking, the standard of review for jury instructions is abuse of discretion.’ ” Arthur v. Bolen, 41 So.3d 745, 749 (Ala.2010) (quoting Pollock v. CCC Invs. I, LLC, 933 So.2d 572, 574 (Fla.Dist.Ct.App.2006)).
In Ex parte Smiley, supra, our Supreme Court reversed Smiley’s murder conviction, finding that there was insufficient evidence to support the jury’s verdict. In so holding, the Court stated:
“The applicable test is whether a jury might reasonably And that the evidence excluded every reasonable hypothesis except that of guilt; not whether the evidence excludes every reasonable hypothesis but guilt, but rather whether a jury might reasonably conclude that it does. Ex parte Mauricio, 523 So.2d 87, citing Cumbo v. State, 368 So.2d 871 (Ala.Crim.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Stated differently, to support the jury’s verdict of guilty, circumstantial evidence and reasonable inferences therefrom have to be inconsistent with any rational hypothesis of innocence.”
655 So.2d at 1094.
In Ex parte Carter, 889 So.2d 528 (Ala.2004), Carter appealed his conviction for unlawful possession of a controlled substance on the basis that he was entitled to a jury charge on circumstantial evidence. This Court affirmed Carter’s conviction and Carter appealed to the Alabama Supreme Court. On appeal, our Supreme Court held that the trial court properly instructed the jury in Carter’s case. In so finding, the Court recognized that “[a]l- *444 though a trial court may give a circumstantial-evidence instruction if it finds the instruction appropriate or. helpful in a particular case, a trial court is not required to give the jury such an instruction merely because all of the State’s. evidence in a criminal case is circumstantial.” Carter, 889 So.2d at 533. Indeed, the Court recognized that the trial , court’s failure to give the circumstantial-evidence charge did not injuriously .affect Carter’s , substantial rights because the trial court' “properly instructed the jury of the elements of the crime and instructed the jury that it must find each of those elements beyond a reasonable doubt before it c[an] find [the defendant] guilty of the offense.” 889 So.2d at 533.
In the instant case, the circuit court’s decision to deny Chambers’s requested Smiley instruction Was not error in light of our Supreme Court’s holding in Ex parte Carter, 889 So.2d 528 (Ala.2004). Although the circuit court did not give the Smiley instruction, the record indicates that the court did charge the jury on circumstantial evidence, the presumption of innocence, and reasonable doubt,. Therefore, the circuit court did not err as to this issue.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, BURKE, and JOINER, JJ., concur.

. Chambers raised his challenge to the sufficiency of the evidence in three separate issues in his brief to this Court; however, we have consolidated those issues for the’purposes of review on appeal.

. The record indicates that Goff had been diagnosed with terminal colon cancer and was too weak to testify at trial.